

# Fourth Court of Appeals

## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-17-00087-CV

**IN THE MATTER OF S.L., III**

From the 451st Judicial District Court, Kendall County, Texas
Trial Court No. 16-010-JV
Honorable Bill R. Palmer, Judge Presiding

Opinion by:    Sandee Bryan Marion, Chief Justice

Sitting:    Sandee Bryan Marion, Chief Justice
Rebeca C. Martinez, Justice
Patricia O. Alvarez, Justice

Delivered and Filed:  July 26, 2017

AFFIRMED

This is an accelerated appeal of a juvenile court's order waiving its exclusive jurisdiction and transferring S.L., III to district court for criminal proceedings.  S.L., III challenges the juvenile court's finding "that because of the seriousness of the alleged offenses and the background of the child, the welfare of the community requires criminal proceedings."  We affirm the juvenile court's order.

### BACKGROUND

S.L., III is charged with attempted capital murder, aggravated robbery, burglary, and aggravated assault.  After the State filed an original petition for discretionary transfer to district court, the juvenile court signed an order requiring the juvenile probation office to "perform a complete diagnostic study, social evaluation and full investigation of [S.L., III], his circumstances

and the circumstances of the alleged offense" in preparation for the hearing on his discretionary transfer.[1]

After a two-day hearing, the juvenile court signed an order waiving its jurisdiction and transferring S.L., III to district court.  In addition to the findings contained in its written order, the juvenile court also signed additional findings of fact in support of its order.  S.L., III appeals.

## TEXAS FAMILY CODE SECTION 54.02

Section 54.02(a) of the Juvenile Justice Code provides, in pertinent part, that the juvenile court may waive its exclusive original jurisdiction and transfer a child to district court for criminal proceedings if the following is determined:

> (1) the child is alleged to have violated a penal law of the grade of felony;
>
> (2) the child was: (A) 14 years of age or older at the time [of the alleged] offense, if the offense is a … felony of the first degree, …; or (B) 15 years of age or older at the time [of the alleged] offense, if the offense is a felony of the second or third degree …, and no adjudication hearing has been conducted concerning that offense; and
>
> (3) after a full investigation and a hearing, the juvenile court determines that there is probable cause to believe that the child before the court committed the offense alleged and that because of the seriousness of the offense alleged or the background of the child the welfare of the community requires criminal proceedings.

TEX. FAM. CODE ANN. § 54.02(a) (West 2014). When determining the seriousness of the offense alleged and the background of the child pursuant to the third requirement, section 52.04(f) requires the juvenile court to consider the following non-exclusive factors:

> (1) whether the alleged offense was against person or property, with greater weight in favor of transfer given to offenses against the person;
>
> (2) the sophistication and maturity of the child;

---

[1] Copies of the juvenile probation office's discretionary transfer hearing report, S.L., III's juvenile case history, and a confidential psychological assessment were filed with the juvenile court and are contained in the clerk's record filed in this appeal.

(3) the record and previous history of the child; and

(4) the prospects of adequate protection of the public and the likelihood of the rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court.

*Id.* at § 54.02(f).

## STANDARD OF REVIEW

"[I]in evaluating a juvenile court's decision to waive its jurisdiction, an appellate court should first review the juvenile court's specific findings of fact regarding the Section 54.02(f) factors under 'traditional sufficiency of the evidence review.'" *Moon v. State*, 451 S.W.3d 28, 47 (Tex. Crim. App. 2014). Under a legal sufficiency challenge, we credit evidence favorable to the challenged finding if a reasonable factfinder could and disregard contrary evidence unless a reasonable fact finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). If there is more than a scintilla of evidence to support the finding, a legal sufficiency challenge fails. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002); *Faisst v. State*, 105 S.W.3d 8, 12 (Tex. App.—Tyler 2003, no pet.). Under a factual sufficiency challenge, we consider all of the evidence presented to determine if the court's finding is so against the great weight and preponderance of the evidence as to be clearly wrong or unjust. *Moon*, 451 S.W.3d at 46 n.75 (internal citations omitted); *C.M. v. State*, 884 S.W.2d 562, 563 (Tex. App.—San Antonio 1994, no writ). Our review of the sufficiency of the evidence supporting waiver is limited to the facts the juvenile court expressly relied on in its transfer order. *Moon*, 451 S.W.3d at 50.

We must then review the juvenile court's ultimate waiver decision under an abuse of discretion standard. *Id*. at 47. "That is to say, in deciding whether the juvenile court erred to conclude that the seriousness of the offense alleged and/or the background of the juvenile called for criminal proceedings for the welfare of the community, the appellate court should simply ask, in light of its own analysis of the sufficiency of the evidence to support the Section 54.02(f) factors

and any other relevant evidence, whether the juvenile court acted without reference to guiding rules or principles." *Id*. We must, however, remain mindful that "not every Section 54.02(f) factor must weight in favor of transfer to justify the juvenile court's discretionary decision to waive its jurisdiction." *Id*. A juvenile court does not abuse its discretion if its transfer decision "represent[s] a reasonably principled application of the legislative criteria." *Id*. The juvenile court must, however, "show its work" and specifically state the reasons for waiver. *Id*. at 49. "The juvenile court that shows its work should rarely be reversed." *Id*.

### ANALYSIS

In his brief, S.L., III concedes each of the following requirements for transfer have been met: (1) he is alleged to have violated a penal law of the grade of felony; (2) he was 15 years of age or older at the time he is alleged to have committed the offense which is a felony of the first or second degree and no adjudication hearing has been conducted concerning that offense; and (3) probable cause exists to support a determination that he committed the alleged offense. *See* TEX. FAM. CODE ANN. § 54.02(a). The only requirement S.L., III challenges is whether the welfare of the community requires criminal proceedings because of the seriousness of the offense alleged or his background. As previously noted, in determining whether this requirement is met, the juvenile court must consider the following non-exhaustive factors:

> (1) whether the alleged offense was against person or property, with greater weight in favor of transfer given to offenses against the person;
>
> (2) the sophistication and maturity of the child;
>
> (3) the record and previous history of the child; and
>
> (4) the prospects of adequate protection of the public and the likelihood of the rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court.

*Id.* at § 54.02(f).

A.      Section 54.02(f) Factors

Under the applicable standard of review, we first examine the sufficiency of the evidence to support the trial court's findings regarding the Section 54.02(f) factors. *Moon*, 451 S.W.3d at 47.

1.      Nature of the Offense

In his brief, S.L., III contends the juvenile court failed to "show its work" with regard to its finding that the welfare of the community required criminal proceedings based on the seriousness of the offense. *See Moon*, 451 S.W.3d at 49 (stating juvenile could must "show its work"). In making this assertion, S.L., III only refers to the findings contained in the juvenile court's order and does not make reference to the additional findings of fact made by the juvenile court that relate to the seriousness of the offense.

The juvenile court's order specifically finds the alleged offenses are against a person, were of a serious nature, and involved the use of a deadly weapon. In its additional findings, the juvenile court also found S.L., III and another juvenile, R.E.J., burglarized the victim's home. During the course of the burglary, the victim was stabbed multiple times in the back. When S.L, III and R.E.J. fled the scene after the victim was stabbed, S.L., III was driving the vehicle. S.L., III was pulled over by a police officer but then sped off, leading law enforcement on a high speed chase reaching speeds in excess of 100 mph. A pursuing officer saw the juveniles throw an item from their car during the chase which was recovered. The item was a truck key that connected the juveniles to another burglary. S.L., III was taken into custody after he collided with another car on the highway. While waiting to be transported to a juvenile facility, S.L., III and R.E.J. were recorded discussing the burglary and stabbing. In that recording, S.L., III admitted participating in the burglary and arming himself with a metal stake before entering the home. A law enforcement officer testified the pointed metal stake S.L., III possessed and the ten inch blade knife R.E.J. used

- 5 -

to stab the victim were deadly weapons. The victim's treating physician described the victim's injuries as serious bodily injuries.

The following summarizes some of the evidence presented at trial which supports the juvenile court's findings.

Officer Evan Downey testified he was dispatched to the victim's residence for an aggravated burglary in progress. In his 911 call, the victim provided a description of the vehicle in which S.L., III and R.E.J. fled. When Officer Downey spotted the vehicle and initiated a traffic stop, the vehicle ran a stop sign and almost hit another vehicle. Officer Downey exited his vehicle and instructed the occupants to exit their vehicle, but the vehicle sped off. During the subsequent high-speed chase, the vehicle had no regard for other drivers. Officer Downey stated the vehicle drove on the wrong side of the road, cut cars off, weaved in and out of traffic, and was going 100 miles per hour as they approached an elementary school. At one intersection, the vehicle ran a red light and almost t-boned an 18-wheeler and a truck. The vehicle entered a highway, sideswiped a few cars, and ran into a vehicle before coming to a stop almost twelve miles from the start of the chase. Photographs of the vehicle S.L., III was driving and the vehicle into which he collided and a videotape of the chase were admitted into evidence. Officer Downey testified S.L., III was driving the vehicle, but he did not have a driver's license. The vehicle belonged to S.L., III's mother. A second videotape of a conversation that occurred between S.L., III and R.E.J. while being detained in Officer Downey's vehicle also was admitted into evidence. In this videotape, S.L., III and R.E.J. laughed about the offense.

Dr. Victor Vela, the victim's treating physician, stated the victim had three wounds approximately two inches wide and an inch-and-a-half deep. Dr. Vela testified the victim was extremely fortunate that the wounds did not penetrate his chest cavity or hit an artery.

Officer Matthew Schultz was dispatched to the victim's residence. Upon arriving, he located the victim, who was heavily bleeding and almost incoherent, and began applying pressure to the wounds to stop the bleeding. Officer Schultz continually changed the bandages as they became soaked with blood. Officer Schultz stated the wounds were very close to vital organs.

Investigator Richard Davila testified officers in pursuit of S.L., III during the chase observed items being thrown from the car. One of the items that was recovered was a Ford key which was later identified as a key taken from another house that had previously been burglarized. On cross-examination, Investigator Davila stated he was not aware that R.E.J.'s fingerprints were found at the other house but S.L., III's were not. Investigator Davila stated the key was thrown from the passenger side of the vehicle.

Deputy James Whitt identified two weapons recovered at the scene. The first was a ten-and-a-half inch knife. The second was a forty-eight inch metal yard stake with a sharp pointed end. On the videotape of the conversation between S.L., III and R.E.J., S.L., III admits he took the stake into the house.

The victim testified he had dressed and was preparing to leave his house. When he passed the study, he saw an iron stake on the couch that was generally stored in the garage. When the victim entered the study and walked toward the couch, he felt a severe blow from behind that pushed him onto the couch. He then felt very rapid hard blows to his right shoulder area. When the victim turned to fight the attacker, he saw the attacker holding a knife and then saw the attacker and another individual run from the room.[2] The victim chased the two individuals through his garage and saw them get into a car in his driveway. The victim then called 911 while pushing his back against the wall to try to stop the bleeding. The victim was taken to the hospital. To avoid

---

[2] The victim later identified R.E.J. as the attacker.

infection, the wounds in his back were not closed, but had to be packed with gauze twice a day for five weeks. The victim described the pain he experienced in packing the wounds as the most excruciating he had felt in his life. The victim also described the mental trauma of no longer feeling safe in his home.

Gary Manitzas, the mayor of the community where the victim lived, testified violence against a person was not common in their community. Manitzas stated the people of the community expressed shock and concern that such a serious crime in which the victim could have been killed was committed by juveniles.

Having reviewed all of the evidence, we hold the evidence is legally and factually sufficient to support the juvenile court's findings that the offense was committed against a person and was of a serious nature.

2.      S.L., III's Sophistication and Maturity

S.L., III was fifteen when the offense was committed and sixteen at the time of the hearing. In its order, the juvenile court found S.L., III "is sufficiently sophisticated and mature enough to be transferred into the criminal justice system and he understands the allegations, the court proceedings, and their possible consequences." The juvenile court also found S.L., III "is able to assist his attorney in his defense." In its additional findings of fact, the juvenile court cited the following evidence to support its finding that S.L., III is sophisticated and mature enough to stand trial as an adult:

> a) Dr. Lisa Watts, a clinical psychologist, tested and evaluated [S.L., III] and concluded that he was able to understand the allegations and court proceedings.
>
> b) Dr. Joann Murphey believed [S.L., III] was capable of understanding the psychologist's role in his evaluation and the limits on confidentiality. She believed he has a limited ability to assist his attorney.

c) Juvenile Probation Officer Debbie Gilbert believed [S.L., III] fully understood the seriousness of the allegations against him as well as the legal consequences.

d) [S.L., III] admitted his role in the burglary to Dr. Joann Murphey and demonstrated that he knew right from wrong.

e) Dr. Watts and Dr. Murphey did not believe [S.L., III] has any serious mental health issues that would prevent him from understanding the legal proceedings and the difference between right and wrong.

f) Judge Debby Hudson gave [S.L., III] the required warnings pursuant to Tex. Fam. Code § 51.095 and she believed he fully understood the warnings. [S.L., III] refused to waive his constitutional rights.

Judge Debby Henson is the magistrate judge who gave S.L., III the required juvenile warnings. Judge Henson testified she believed S.L., III understood his rights. Judge Henson believed S.L., III's immediate decision not to make any statement after he was given his warnings was an indication of his maturity and sophistication.

The trial court took judicial notice of the discretionary transfer hearing report and the clinical psychologist report prepared by Dr. Lisa Watts. *See* TEX. FAM. CODE ANN. § 54.02(e) ("At the transfer hearing the court may consider written reports from probation officers, professional court employees, or professional consultants in addition to the testimony of witnesses."). The discretionary transfer hearing report made reference to S.L., III's psychological evaluation with Dr. Watts. The report stated S.L., III's attorney was present at the evaluation and, on advice from his attorney, S.L., III refused to answer many questions that were asked. Dr. Watts's report stated S.L., III's achievement functions did not fall significantly below his cognitive abilities.

Deborah Gilbert, the probation officer who prepared the discretionary hearing transfer report, testified she was aware R.E.J. made a full confession while S.L., III did not. Gilbert agreed

this demonstrated S.L., III was exercising more self-preservation. In response to whether S.L., III had made a sophisticated decision, Gilbert responded that she thought "he's smart enough."

Dr. Joann Murphey was retained by defense counsel to conduct an evaluation of S.L., III. Dr. Murphey did not believe S.L., III should be certified as an adult. Dr. Murphey testified S.L., III was doing well in juvenile detention and was progressing academically. Dr. Murphey stated S.L., III was cognitively functioning at the level of a twelve-year-old at the time of the offense, and was currently functioning almost at the level of a fourteen-year-old. Dr. Murphey did not believe S.L., III had the sophistication and maturity to assist in his defense. On cross-examination, Dr. Murphey agreed Dr. Watts believed S.L., III understood the legal proceedings he was facing.

Having reviewed all the evidence, we hold the evidence is legally and factually sufficient to support the juvenile court's finding that S.L., III was sophisticated and mature enough to be transferred into the criminal justice system.

3.    S.L., III's Record and Previous History

In its transfer order, the juvenile court specifically found S.L., III had no prior referrals to the juvenile system but his previous history supported that he should stand trial as an adult. In its additional findings of fact, the juvenile court cited the following evidence as support for its finding that S.L., III's record and referral history supported transfer to adult court:

a) [S.L., III] was removed from Edison high school by his mother due to excessive absenteeism.

b) [S.L., III] had several school violations dating back to 2012. He had been suspended for marijuana usage.

c) [S.L., III] was not in any school environment at the time of the offense.

d) [S.L., III's] mother expressed concern that her son was using drugs, associating with known gang members, refusing to go to school, and not coming home at night.

e) [S.L., III's] mother admitted she sometimes let [S.L., III] drive her car despite the fact he was not licensed to do so. She also stated that he took her car on other occasions without her permission.

f) [S.L., III] drove in an excessively high speed chase on busy public roads, during a school day, endangering the lives of many other drivers while fleeing from the police.

g) [S.L., III's] cell phone pictures showed [S.L., III] posing with a gun. His text messages demonstrated that he was close friends with known gang member Jacob "Enzo" McCumber.

Investigator Tony Kobryn examined S.L., III's cell phone. A report listing the content of the cell phone and photographs recovered from the cell phone were admitted into evidence, including photographs of S.L., III holding a gun.

Deputy Whitt, who recovered the weapons from the victim's home, also did research into the DATK gang mainly through social media and Facebook. Postings from two DATK members, John Serros and Jacob "Enzo" McCumber, were admitted into evidence. Serros posted a photograph of the scene where R.E.J. and S.L., III were arrested with the comment, "Free the savages [R.E.J.] and [S.L., III]. Keep it DATK." In response to a question posted about the reason R.E.J. and S.L., III were in Fair Oaks where the robbery occurred, Serros responded, "They were hitting houses." Enzo posted photographs of the crash site from a news report with a comment to "free my boyss [sic]." Enzo's Facebook page also contained photographs of S.L., III and R.E.J. together, including a video of them using narcotics together. Deputy Whitt also researched S.L., III's Facebook page. Deputy Whitt described the Facebook page as making references to narcotics, drug dealing, guns, and gang activity. The page contained a video of a drive-by shooting in which S.L., III was a passenger in the back seat of the car. On cross-examination, Deputy Whitt testified he was not certain if S.L., III was a documented gang member. Lieutenant Thomas Matjeka also reviewed S.L., III's Facebook page and stated S.L., III's postings show that he associates and interacts with known gang members.

Lieutenant Matjeka also reviewed the cell phone records from S.L., III's phone. Lieutenant Matjeka testified several text messages referred to S.L., III's drug use and to his committing crimes with R.E.J. and Enzo. He also testified the text messages S.L., III exchanged with his mother demonstrated that she allowed him to drive her car and knew about his drug use. The phone also contained several photographs showing S.L., III using drugs.

The discretionary transfer hearing report stated S.L., III's mother and father reported S.L., III was a good and respectful boy until eighth grade when he no longer wanted to play football and started hanging out with the wrong people. S.L., III began using marijuana when he was fourteen, but he did not believe his drug use caused any problems. S.L., III's mother was aware that S.L., III used marijuana. Although S.L., III is not a documented gang member, two of his friends are confirmed gang members. Because S.L., III was not attending school, his mother unenrolled him from school on February 1, 2016, with the intention of enrolling him in a different school. S.L., III had not been enrolled in school for almost two months when the offense occurred on March 23, 2016. S.L., III had a history of school-related violations for marijuana and fighting. S.L., III had participated well in detention and was being attentive and respectful to detention staff.

S.L., III's mother testified S.L., III began changing toward the end of eighth grade when he began hanging out with R.E.J. S.L., III lost interest in school and began skipping classes. When S.L., III was written up in school for marijuana, S.L., III's mother sought help through an employee assistance program at her work., and S.L., III began counseling. He had attended three counseling sessions during the month of February before the offense occurred. S.L., III's mother stated she unenrolled him from school with the intention of enrolling him in a different school away from the people who were influencing him. S.L., III's mother knew he continued to hang out with the same people after she unenrolled him, but she stated she took measures to punish him. S.L., III's mother testified she was not aware S.L., III would drive her car. She stated she was having difficulty re-

enrolling S.L., III in a new school because he would not come home, and she did not know where he was.

Having reviewed all of the evidence, we hold the evidence is legally and factually sufficient to support the juvenile court's finding that S.L., III's prior history supports that he should stand trial as an adult.

    4.      Prospects of Adequate Protection and Likelihood of S.L., III's Rehabilitation

In its transfer order, the juvenile court found the procedures, services, and facilities available to the juvenile court are inadequate to rehabilitate S.L., III while also protecting the public because of S.L., III's previous history and the extreme and severe nature of the alleged offenses. In its additional findings of fact, the juvenile court cited the following evidence in support of its finding that the prospects of adequate protection of the public and the likelihood of the rehabilitation of the child require transfer to adult court:

> a) Licensed clinical social worker Maria Mejia diagnosed [S.L., III] with oppositional defiance disorder. She explained this meant he refused to comply with rules and was defiant with authority figures.
>
> b) Mejia believed his prognosis was at best guarded because [S.L., III] did not believe his behaviors - truancy, drug abuse, and negative peer associations - were problematic.
>
> c) [S.L., III] abused narcotics and presented with a substance abuse problem.
>
> d) [S.L., III] attended only three session [sic] of counseling despite the counselor's recommendation for at least eight to ten months of therapy. This was despite the fact that his mother's insurance would cover the therapy.
>
> e) Dr. Murphey testified that [S.L., III] possesses less energy than most adolescents and is not inclined to alter his life or to find new peer activities or directions.
>
> f) Dr. Murphey found that "he may be so indifferent as to fail to heed recommendations or to comply to agreed[-]upon decisions for action and change."
>
> [g]) A video recording of [S.L., III] showed he lacked remorse for the offense.

[h]) [S.L., III] associated with other known gang members.

[i]) [S.L., III] lacked adequate supervision in the home as demonstrated by staying away from home on numerous occasions without his mother's permission; using narcotics repeatedly, refusing to attend school, and lying to his mother. [S.L., III's]s mother failed to enroll [S.L., III] in school for two months. She also failed to continue [S.L., III's] recommended counseling and encouraged his illegal driving. Text messages showed [S.L., III's] father as possibly providing drugs to [S.L., III].

[j]) The victim and other members of the community expressed an ongoing fear of [S.L., III].

[k]) [S.L., III] is currently 16 years and approximately four months old. A probation in juvenile court would only last until age 18. A placement in TJJD would end at age 19.

The discretionary hearing transfer report noted if S.L., III was not transferred to adult court, he would only be under direct supervision for less than two years unless he was committed to TJJD on a determinate sentence. The probation department recommended that S.L., III not be transferred to adult court. Instead, the probation department recommended that S.L., III be committed to TJJD on a determinate sentence. Deborah Gilbert, the probation officer who prepared the discretionary hearing transfer report, testified she recommended that S.L., III not be certified as an adult. On cross-examination, Gilbert testified she was not aware that TJJD would make the decision whether S.L., III would be placed on parole or go to an adult prison if S.L., III was given a determinate sentence. Gilbert was also not aware that TJJD would not consider the seriousness of the offense in making that decision.

Dr. Murphey testified Texas has a very good system for dealing with juveniles. Dr. Murphey believed S.L., III's participation in the juvenile program would provide adequate protection for the community. On cross-examination, Dr. Murphey stated she had not reviewed the police reports regarding he offense or the information obtained from S.L., III's cell phone. Dr. Murphey also had not watched the videotape of the conversation between S.L., III and R.E.J. while

they were detained. Dr. Murphey agreed S.L., III required a structured setting to avoid problems like gangs and drugs and to ensure that he attended school.

Maria del Carmen Mejia-Desatnik is the licensed counselor who saw S.L., III for three counseling sessions. Mejia diagnosed S.L., III as having Oppositional Defiant Disorder which involves a pattern of noncompliance to authority figures. S.L., III's mother brought S.L., III for treatment based on his failure to attend school, hanging out with the wrong people, and using drugs; however, Mejia stated S.L., III had limited realization or acceptance that his behaviors were problematic. Mejia believed S.L., III would have required therapy for eight to ten months, but the therapy ended when S.L., III was placed in juvenile detention after the three sessions.

Although both Gilbert and Dr. Murphey believed S.L, III should not be transferred, after reviewing all of the evidence, we hold the evidence is legally and factually sufficient to support the juvenile court's finding that the procedures, services, and facilities available to the juvenile court are inadequate to rehabilitate S.L., III while also protecting the public.

B.      Did the juvenile court abuse its discretion?

Having held the evidence is sufficient to support the juvenile court's findings as to each of the section 54.02(f) factors, we next decide whether the juvenile court abused its discretion in determining both the seriousness of the alleged offenses and S.L., III's background required criminal proceedings for the welfare of the community. *Moon*, 451 S.W.3d at 47.

As previously detailed, the offense involved a violent attack on a homeowner during the course of a burglary. S.L., III entered the home armed with a forty-eight inch metal yard stake with a sharp pointed end. The garage door was open and two vehicles were parked in the garage, indicating a person was inside the house. Several witnesses testified to the amount of blood the victim lost and the treatment he had to undergo. In addition, several witnesses testified the victim was fortunate that his chest cavity, an artery, or another vital organ was not punctured. Given the

juvenile court's detailed findings regarding the seriousness of the offense and the sufficiency of the evidence to support those findings, we hold the juvenile court did not abuse its discretion in concluding the welfare of the community required criminal proceedings because of the seriousness of the alleged offense.

Although S.L., III did not have a previous referral to the juvenile system, the evidence established a history of criminal behavior, including drug use and gang activity. S.L., III had several school disciplinary referrals, including referrals for drug possession or use, and had not been enrolled in school for almost two months. Dr. Murphey testified S.L., III would require a structured environment. Because of his age, however, S.L., III might only be under the direct supervision of the juvenile justice system for two years. Given the juvenile court's detailed findings regarding S.L., III's background and the sufficiency of the evidence to support those findings, we hold the juvenile court did not abuse its discretion in concluding the welfare of the community required criminal proceedings because of S.L., III's background.

## CONCLUSION

The juvenile court's order is affirmed.

Sandee Bryan Marion, Chief Justice